## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CORINNE OMWENGA** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**UNITED NATIONS FOUNDATION** )<br>)<br>**Defendant.** ) | Case No. 1:15-cv-00786 |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Corinne Omwenga ("Plaintiff" or "Omwenga"), by and through undersigned counsel, hereby files this Opposition to Defendant United Nations Foundation's ("UNF") Motion to Dismiss her Second Amended Complaint ("MTD"). As set forth more fully below, Plaintiff's Second Amended Complaint ("SAC") alleges facts sufficient to support her claims arising under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"); the District of Columbia Human Rights Act, D.C. Code §§ 2.401.01 et seq. ("DCHRA"); and the common law of the District of Columbia. Defendant's motion takes an impermissibly narrow view of existing case law, cites to purported legal authority without regard to the procedural posture of that authority, and fails to recognize the tenet that, at the motion to dismiss stage, all reasonable inferences must be drawn in favor of the plaintiff. Because Plaintiff has more than met her burden with respect to the allegations set forth in her SAC, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss in its entirety. A proposed order accompanies this opposition.

1

## FACTUAL SUMMARY

Plaintiff is a 42-year-old black female who was born in Kenya and immigrated to the United States. SAC ¶ 21. She holds a Master's degree in Science and an M.B.A. from the University of Maryland system. *Id.* ¶ 22. She also has substantial experience working for nonprofit organizations that rely upon USAID and other government grants. *Id.*

UNF is a non-profit foundation founded in 1998. *Id.* ¶ 26. On June 30, 2014, Plaintiff applied for a Director-level position with UNF but did not receive a response to this application. *Id.* at ¶ 45. Instead, UNF contacted Plaintiff and asked her to interview for a Compliance Officer position, one for which she did not apply, that is below that of Director, and that would pay substantially less than the position for which she applied. *Id.* ¶ 45-48. Plaintiff interviewed with David Burton, Executive Director of Business Services, Budgets and Reporting ("BSBR"), Lara Sonti, Counsel and Senior Director of the Contracts department, and Beth Bowers, Associate from the strategic team. Plaintiff also had a second interview with Walter Cortés, the Chief Financial Officer. *Id.* ¶ 47.

Plaintiff accepted UNF's offer for the Compliance Officer position and began working in UNF's BSBR department in July 2014. At the time of Plaintiff's hire, all other BSBR employees were Caucasian. *Id.* ¶ 54. Several colleagues, including an individual from the Human Resources department, commented to Plaintiff that they were "shocked" that UNF had hired a black person to work in what was previously an entirely Caucasian BSBR department. *Id.* ¶ 55-6.

UNF hired Andrew McDermott, a Caucasian male in his mid-thirties, into the Director-level position for which Plaintiff originally applied. *Id.* ¶ 50. McDermott was less qualified for the position than Plaintiff. He lacked a Master's degree, had never worked for a non-profit, and had no experience handling government funds prior to his employment with UNF. *Id* ¶ 51-2.

In October 2014, USAID awarded UNF a $20,000,000 grant for the Mobile Hub project. *Id.* ¶ 57. McDermott's lack of knowledge regarding the administration of federal grants became increasingly apparent as he was unable to complete even the most basic tasks associated with the budget and execution of the Mobile Hub project. *Id.* ¶ 70-2. Around this same time, Burton provided Plaintiff with a favorable three month review, indicating that he and UNF was pleased with her work. *Id.* ¶ 69.

UNF named McDermott the financial manager of the USAID Mobile Hub project and assigned Plaintiff to work as his Compliance Officer. *Id.* ¶ 58. In December 2014, Plaintiff learned that Defendant charged unallowable expenses to the USAID funded sub-award project CH-MHA-13. *Id.* ¶ 74. Though McDermott was the financial manager of the project, Plaintiff immediately notified Cortés (CFO), Burton (Executive Director), and Camila Campo (accounting) of her concerns that UNF was attempting to charge unallowable expenses against the government grant. *Id.* ¶ 75. Soon after, she discovered and disclosed that UNF was posting transactions to a new USAID sub-award, CH-MAM-02, that was not yet issued or executed. *Id.* ¶ 77.

In or about December 2014, Plaintiff approached Maxine Somerville, Executive Director for Human Resources, and asked, "Why was I not selected for the director position, yet I'm clearly more qualified than McDermott?" or words to that effect. *Id.* ¶ 88. She also stated that she did work that was equivalent to that performed by the directors within the department. *Id.* ¶ 89. Each of the individuals to whom Plaintiff compared herself was Caucasian. *Id.* ¶ 90. Plaintiff followed up on this discussion with a December 11, 2014, e-mail to Somerville, in which Plaintiff writes:

> It feels like I face ***disparate treatment*** in my department… All direct reports to David, my boss, in his capacity as the Executive

> Director have the title of Director with an exception of me. I have
> the same level of qualifications, carry out advisory level functions
> and have oversight for a variety of team's work although I don't
> supervise anyone

*Id.* ¶ 92; MTD at Ex. 1 (emphasis added).  As noted, David [Burton] is Caucasian and "[a]ll

direct reports to David" are also Caucasian. SAC ¶ 90.   On January 23, 2015, after Plaintiff

returned from an approximately four week trip home to Kenya, Plaintiff received an e-mail from

Somerville indicating that Somerville spoke to Burton about the concerns raised in her December

11, 2014, e-mail. *Id.* ¶ 98-100.

Throughout January 2015, Plaintiff identified and disclosed numerous illegal

transactions, unallowable charges to the government, unethical conflicts of interest, and

consulting arrangements that violated governing regulations.  *Id.* ¶ 104-12; ¶ 124-5.

Subsequently, Plaintiff took it upon herself to look deeper into the USAID Mobile Hub project

costs, including a line item review of all incurred expenses on the project that had already been

submitted. *Id.* ¶ 115.

When Plaintiff e-mailed Cortés and Burton regarding these unallowable expenses and

false Federal Financial Reports, Burton responded "talk offline." *Id.* ¶ 118.  Burton later told

Plaintiff that, because she was questioning financial transactions that had already been paid by

the U.S. government, she was "embarrassing" the organization. *Id.* ¶ 123.  Furthermore, Burton

told Plaintiff that he "didn't want questions asked about consultant conflicts of interest," or

words to that effect. *Id.* ¶ 126.  Plaintiff then took her complaints to Sonti, counsel for UNF.

During a February 4, 2015, lunch meeting with Burton and Sonti, Plaintiff again disclosed her

concerns about the issue of UNF's project teams circumventing contracting regulations. *Id.* ¶

129.  In what would be her last attempt to address UNF's contracting improprieties, Plaintiff met

with Cortés to discuss her concerns regarding conflicts of interest on a $2,600,000 consulting

contract with Dalberg and a $660,000 contract with Pricewaterhouse Coopers.  *Id.* ¶ 132-9.

Cortés told Plaintiff to "let it go" and indicated that it would be unlikely that the Mobile Hub

project would be subject to an audit. ¶ 139.

On February 18, 2015, the same day that Plaintiff was supposed to receive feedback on

her December 11, 2014, complaint to Somerville, Defendant terminated Plaintiff's employment.

*Id.* ¶ 140.  HR Representative Kawanna Jenkins assured Plaintiff that her performance was not in

question, adding, "It's not you." *Id.* ¶ 142.

## PROCEDURAL OVERVIEW

Plaintiff filed her complaint under seal on May 28, 2015, alleging substantive violations

of the FCA as well as individual employment claims arising under the same statutes identified in

her SAC, plus a retaliation claim arising under the National Defense Authorization Act

("NDAA").  After the United States declined to intervene in her *qui tam* case, Plaintiff filed a

First Amended Complaint on May 5, 2016, which, as consented to by the United States,

effectively dismissed her claims arising under the substantive provisions of the FCA.[1]

After reviewing Defendant's June 20, 2016, Motion for Partial Dismissal of Plaintiff's

First Amended Complaint, Plaintiff obtained consent from Defendant to file a Second Amended

Complaint and was granted leave by the Court to do so.  On July 19, 2016, Plaintiff filed her

SAC which, among other things, dropped her claim arising under the NDAA and addressed

Defendant's arguments in support of its Motion for Partial Dismissal.

## ARGUMENT

### I.    SUMMARY

---

[1]     Any dismissal of a substantive FCA claim is without prejudice to the United States.

As discussed more fully below, Defendant's motion asks the Court to take extraordinary leaps that are belied by the facts of this case and contrary to applicable law. For example, Defendants argue that a black woman who works in an entirely Caucasian department is not protected from retaliation where she, referring to four Caucasian colleagues and working under the direction of a Caucasian supervisor, explicitly complains in writing about "disparate treatment."

Likewise, Defendant takes the remarkable position that where a Compliance Officer complains of charging unallowable expenses on a government contract to her first line supervisor, then to her second line supervisor, then to her third line supervisor, and, finally, to counsel for the organization, that she has not engaged in protected activity under the FCA. Defendant further posits that a company lacks notice of protected activity where management's response to the employee's complaints of unallowable expenses being charged to the government is to: "talk offline" about her concerns; that she is "embarrassing" the organization; that management "didn't want questions asked about consultant conflicts of interest;" and that it was unlikely that the complained-of project would be subject to an audit. Defendant's motion is without factual or legal merit and routinely fails to distinguish precedent involving cases decided on summary judgment versus those decided on a motion to dismiss. Accordingly, Plaintiff respectfully requests that Defendant's motion be denied in its entirety.

## II.    LEGAL STANDARD

A pleading should not be dismissed for failure to state a claim unless it fails to "plead 'enough facts to state a claim to relief that it is plausible on its face.'" *See Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 67 (D.D.C. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff "is not required to establish a *prima facie* case at the pleading stage."

*Chandler v. Bernanke*, 531 F. Supp. 2d 193, 199 (D.D.C. 2008). The "*prima facie* case operates

as a flexible evidentiary standard, [and] it should not be transposed into a rigid pleading standard

for discrimination cases." *Chandler*, 531 F. Supp. 2d at 199 (quoting *Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 512 (2002)).

When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P.

12(b)(6), the Court must presume that the allegations in the complaint are true and draw "all

reasonable factual inferences" in favor of the plaintiff. *Rattigan*, 503 F. Supp. 2d at 67. Thus, in

determining whether Plaintiff's complaint against UNF may be dismissed, the Court must

evaluate whether Plaintiff has "raised a right to relief above the speculative level," assuming the

facts which she alleges, and all logically flowing inferences, are true in her favor. *See id.* at 67;

*see also Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal

citations omitted)  (providing, "[W]e must treat the complaint's factual allegations as true and

must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."). In

assuming that the facts in Plaintiff's SAC are true and granting all inferences in her favor, there

exists a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to

support the claim[s]." *Twombly*, 550 U.S. at 559.

## III.    DRAWING ALL INFERENCES IN PLAINTIFF'S FAVOR, THE COURT SHOULD CONCLUDE THAT DEFENDANT HAD KNOWLEDGE OF PLAINTIFF'S FCA-PROTECTED ACTIVITY.

Defendant's sole argument in support of dismissal of Count I is that Plaintiff failed to

engage in protected activity.  More specifically, Defendant argues that Plaintiff failed to put

Defendant "on notice" of her protected activity.  When Plaintiff's protected activity is evaluated

against the underlying purpose of the statute as well as the relevant case law, it is clear that

Defendant's argument cannot stand.  Plaintiff gave notice by going outside her chain of

command and Defendant effectively confirmed notice of her complaints by attempting to silence her.

A.     The FCA requires a broad interpretation of protected activity.

A retaliation claim under the False Claims Act has two elements: protected activity by an employee and retaliation by the employer against the employee because of those acts. *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).  Recent amendments to the FCA's anti-retaliation provision were designed to *expand* protections to whistleblowers under the FCA.  *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a) & (d), 123 Stat. 1617, 1621–25 (amending retaliation provision); *U.S. ex rel. New Mexico v. Deming Hosp. Corp.,* 992 F. Supp. 2d 1137, 1163 (D.N.M. 2013) (amended version of the retaliation provision "represents a significant expansion of protection for [False Claims Act] whistleblowers"); *see also Hicks v. D.C.*, 2016 WL 1704119 (D.D.C. Apr. 28, 2016).  "Protected activity includes both 'lawful acts done by the employee ... in furtherance of an action' under the False Claims Act and 'other efforts to stop 1 or more violations of' the False Claims Act. *Id.* (citing 31 U.S.C. § 3730(h)).  "Ultimately, the determination of what activities constitute 'protected activity' is a fact specific inquiry, and as the D.C. Circuit has noted, *'protected activity' was meant to be interpreted broadly." Pencheng Si v. Laogai Research Found*., 71 F. Supp. 3d 73, 99–100 (D.D.C. 2014) (citing *Yesudian*, 153 F.3d at 741) (emphasis added).

"Plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice.'"  *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1261 (D.C. Cir. 2004) (citations omitted).  The court has said going outside the usual chain of command with disclosures can be notification to the

employer of protected activity. *See Id.,* 389 F.3d at 1261 ("when an employee acts outside his normal job responsibilities *or alerts a party outside the usual chain of command*, such action may suffice to notify the employer that the employee is engaging in protected activity (emphasis added)); *Id.* (An employee "need not announce he had gone outside of [her] institution" in order for her disclosure to be protected under the FCA. (citing *Yesudian,* 153 F.3d at 743)).   An FCA retaliation claim will be upheld where, for example, the plaintiff informs an employer's legal counsel about fraud. *Id.* (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 861, 864 (7th Cir.1994)).   In fact, the court has stated "[a]n employee whose job responsibilities coincide with statutorily protected activity [need not] incant talismanic words to satisfy the notice element."  *Martin-Baker*, 389 F.3d at 1262.  As discussed more fully below, Plaintiff's disclosures fit within the definition of protected activity.

   B.   Plaintiff investigated and disclosed numerous false claims.

   Plaintiff's SAC alleges facts sufficient to establish that UNF had notice of her "efforts to stop 1 or more violations of the FCA," especially in light of the fact that all reasonable inferences must be drawn in her favor.  *Sparrow*, 216 F.3d at 1113.  In or around December 2014, Plaintiff learned that Defendant charged unallowable expenses to a USAID contract.  SAC ¶ 74.  Rather than take her concerns to McDermott, the financial manager of the project, Plaintiff immediately notified Defendant's Chief's Financial Officer, Cortés, and the Executive Director of her department, Burton.  *Id* .¶ 75.  Over the following months, Plaintiff continued investigating UNF's charging of unallowable expenses and other contracting violations. *Id.* ¶ 77, 104-5, 109-12.  She took it upon herself to look deeper into the USAID Mobile Hub project costs, including a line item review of all incurred expenses on the project that had *already* been submitted. *Id.* ¶ 115.  She learned that, notwithstanding her admonitions regarding the unallowable expenses, the

Defendant had certified and submitted the Federal Financial Report, SF-425, to the government containing the unallowable expenses discussed with the project team. *Id.* ¶ 116. She further discovered that Defendant paid for, and charged to the USAID contract, first class airline tickets, which she reasonably believed was unallowable under the governing regulations. *Id.* ¶ 121. Having already complained to Burton and Cortés about the aforementioned misconduct, Plaintiff escalated her concerns to Sonti, counsel for UNF, during a February 4, 2015, meeting. *Id.* ¶ 129.

      C.     <u>Defendant's reaction to plaintiff's complaints suggest that it had the requisite "notice" of her protected conduct.</u>

Implicit to Defendant's motion is the premise that had Plaintiff *not* been in a compliance role, the allegations set forth above and in Plaintiff's SAC could, indeed, be viewed as protected activity. *See* MTD at 6 ("[H]er claim collapses *because- given the nature of her job- she* does not and cannot plausibly allege the "knowledge" element that is essential to an FCA retaliation claim.") (emphasis added). Accordingly, Defendant's argument must be examined solely through the narrow inquiry of whether the Plaintiff alleged facts such that an inference could be drawn which would establish that Defendant had notice of her protected conduct. Based on management's responses to her protected activity and drawing all reasonable inferences in her favor, the Court should answer that question in the affirmative.

When Plaintiff first protested the posting of unallowable transactions, she was advised that it was "common practice" in the organization. SAC ¶ 77. She also received "pushback" for reporting the contracting violations. *Id.* ¶ 113. Thus, a reasonable inference can be drawn that the fraud Plaintiff uncovered was only the tip of the iceberg. This led Plaintiff to look deeper into the USAID Mobile Hub project costs, including a line item review of all incurred expenses that had already been submitted. *Id.* ¶ 115. Later, when she put her concerns in writing to the Director of her department, she was told to "talk offline." *Id.* ¶ 118. With respect to this

allegation, an inference can certainly be drawn that the Defendant, fearful of litigation, did not want to create a paper trail documenting the various false claims submitted to the government.

Further, when Burton told Plaintiff that she was "embarrassing" the organization by questioning financial transactions that had already been paid to the U.S. Government, *id.* ¶ 123, a reasonable inference can be drawn that the "embarrassment" referenced by Burton would be a result of the Government discovering the false charges. After months of disclosing concerns on the USAID contract, Cortés told Plaintiff to "let it go" and indicated that it would be unlikely that the Mobile Hub project would be subject to an audit. *Id.* ¶ 139. This establishes that Defendant was evaluating Plaintiff's protected activity against the specter of a government-required audit that could have alerted the government of Defendant's numerous contracting deficiencies. Finally, the fact that an HR Representative told Plaintiff at her termination meeting that Plaintiff's performance was not in question could lead to an inference that it was her protected activity that led to her termination. *Id.* ¶ 142.

D.   In resolving all inferences in Plaintiff's favor, the Court should conclude that Plaintiff approached Sonti in her capacity as corporate counsel and not in her capacity as Director of Contracts.

In a last ditch effort to support its argument, Defendant attempts to cast Plaintiff's disclosures to Sonti as consistent with Plaintiff's job as a Compliance Officer. *See* MTD at 9. As mentioned in *Martin-Baker*, a case dealing with the same issues before the Court, an FCA retaliation claim will be upheld where the plaintiff informs an employer's legal counsel about fraud. 389 F. 3d at 1261 (citing *Neal,* 33 F.3d at 861, 864).[2] While it is true that Sonti functioned

---

[2]     To the extent Defendant attempts to distinguish *Neal* by pointing out that, there, the defendant alerted the government to the plaintiff's disclosures, the same inference can be drawn from ¶ 145-6 of Plaintiff's SAC. Plaintiff should be permitted to take discovery on whether Defendant, as Plaintiff suspects, disclosed to USAID some or all of the unallowable charges and other contracting violations she identified prior to her termination.

as the Senior Director of the Contracts department, she also served as Defendant's corporate

counsel.  SAC ¶ 154.  The plaintiff gets the benefit of the doubt at the motion to dismiss phase.

Accordingly, the Court need not – and, indeed, should not – assume that Plaintiff approached

Sonti in her capacity as Senior Director of Contracts; rather, the Court, for the purposes of

deciding a motion to dismiss, must draw all inferences in Plaintiff's favor and find that her

contact with *corporate counsel*, following months of disclosures to both her immediate

supervisors and beyond her normal chain of command, is protected under the FCA.

### IV.   PLAINTIFF HAS IDENTIFIED A CLEAR PUBLIC POLICY AND A "CLOSE FIT" BETWEEN THAT PUBLIC POLICY AND HER TERMINATION.

Plaintiff's SAC pleads sufficient facts in support of her wrongful discharge in violation of

public policy claim.  In order to state a claim for wrongful discharge in violation of public

policy, a Plaintiff must identify a public policy that is "firmly anchored either in the Constitution

or in a statute or regulation" and a close fit between the policy and conduct at issue in the

wrongful termination.  *Alibalogun v. First Coast Sec. Sols., Inc.*, 67 F. Supp. 3d 211, 217

(D.D.C. 2014) (citing *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 n. 7

(D.C.1999); *Robinson v. Securitas Servs., Inc.*, 819 F. Supp. 2d 18, 20 (D.D.C. 2011); *Carl v.

Children's Hospital*, 702 A.2d 159, 162, 164 (D.C. 1997)).

A.   Plaintiff sufficiently alleges a well-established public policy.

Defendant argues that Plaintiff fails to state a public policy upon which a wrongful

discharge claim can rest.  However, Plaintiff, as the basis for her wrongful discharge claim,

identifies the same policies relied upon in *Myers v. Alutiiq Int'l Solutions, LLC*.  811 F. Supp. 2d

261, 266-7 (D.D.C. 2011).  In *Myers*, the court found that 5 U.S.C. § 2302, along with other

pieces of legislation, protect both private and government employees under whistleblower

statutes, and the court found that these statutes were "illustrative of the strong public policy against conflicts of interest and favoring the protection of whistleblowers." *Id.*

Additionally, the *Myers* court said the plaintiff was not required to establish in the pleading that the defendant actually violated the specific regulations cited as illustrative of an important public policy. Rather, the policies cited need only show that there is a strong public policy against retaliation for conduct of this type. *See id.* at 267. Ultimately, the court concluded that the "plaintiff has alleged sufficient facts to make plausible the conclusion that defendants fired him in retaliation for reporting alleged violations of federal contracting regulations." *Id.* at 267-8; *see also Holman v. Williams,* 436 F. Supp. 2d 68, 78 (D.D.C. 2006) (providing, "It is sufficient to survive a motion to dismiss that [the plaintiff] reported [corruption in government contracting] to other officials in the administration and that (plaintiff alleges) he was fired for doing so.").

Like in *Myers*, Plaintiff has cited in her pleadings numerous regulations, including 2 C.F.R. § 200.112, 2 C.F.R. § 200.318, and 48 C.F.R. § 3.101−1, that allow the court to draw the conclusion that there is a strong public policy against retaliatory termination of an employee who speaks out against conflicts of interest related to the use of government funds and related programs. *See Clay v. Howard Univ.,* 128 F. Supp. 3d 22, 28 (D.D.C. 2015) ("*Clay II*") (interpreting the holding in *Myers* as, "[A]llegations that plaintiff was terminated after reporting improper conflicts of interest in government contracting sufficed to state claims grounded in the public policy of encouraging reporting of problems in federal programs"). Also, since the *Myers* court found the avoidance of conflicts of interest in federal programs to be a public policy violation worthy of an exception to at-will employment, no new exception category need be

created for Plaintiff.  Plaintiff falls neatly within the *Myers* exception as recognized by this Court in *Clay II*.

B.  <u>Plaintiff sufficiently alleges a close fit between the public policy and her termination.</u>

"There must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Carl v. Children's Hosp.*, 702 A.2d 159, 164 (D.C. 1997).  In analyzing this "close fit" requirement, "[a] majority of the court in *Carl* elaborated that… a court need only decide whether the firing, because of the plaintiff's conduct, is sufficiently within the scope of the policy embodied in the statute so that a court may consider imposing liability on [the defendant] for [the plaintiff's] termination for otherwise permissible reasons." *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 21 (D.D.C. 2002) (internal citations omitted).  *Carl* involved a plaintiff who alleged that her termination was in retaliation for having testified before the Council of the District of Columbia, taking a position contrary to the interest of her employer. *Carl.,* 702 A.2d at160.  In discussing the *Carl* decision, the *Myers* court explained that a "close fit" between the public policy at issue and the plaintiff's termination was found because the termination was "the most severe and most effective" way for an employer to retaliate for an employee's testimony before the Council.  *Myers*, 811 F. Supp. at 266.  In the instant matter, Plaintiff's termination was "the most severe and most effective way" Defendant could discourage reporting of problems and conflicts of interest in federal programs*. See also Clay*, 128 F. Supp. 3d at 28.

While the public policy exception to the at-will employment doctrine is "narrow," Defendants take this premise to the extreme. As was articulated in *Myers* and noted by this Court in *Clay II*, the public policy at issue is "encouraging reporting of problems in federal programs." *Clay*, 128 F. Supp. 3d at 28*.* This Court elaborated on its view of *Myers* when it stated, "[t]he

public policy implicated in *Myers* also related to integrity in taxpayer money, but was *specifically based in laws and regulations protecting whistleblowers who revealed conduct threatening that integrity.*" *Id.* at FN 2 (emphasis added). Plaintiff, as in *Myers*, has properly identified the reporting of conflicts of interest in federal programs as the public policy underpinning her termination. If adopted, Defendant's argument would require a plaintiff to show that a defendant actually *violated* each of the particular regulations that form the basis of the public policy at issue.[3]  This is not the law.  *See Myers,* 811 F. Supp. 2d at 267 ("[a] plaintiff is not required to establish here that his employers violated any particular provision of the FAR").

Plaintiff states in her SAC that on February 4, 2015, she disclosed to Burton and Sonti, among other things, conflicts of interest issues associated with UNF's contracting relationships. *See* SAC ¶ 127.  Plaintiff then states that on February 18, 2015, she was terminated.  *See id.* 140. Conflicts of interest are directly addressed in the public policies detailed by Plaintiff in her SAC. *See id.* ¶ 35-6, 127, 139, 160.  Her complaints about UNF's inappropriate conflicts of interests fit squarely into those public policies, and Plaintiff was terminated two weeks after disclosures pertaining to the same.  Because the court must resolve all inferences in favor of the Plaintiff in a motion to dismiss, Plaintiff has sufficiently alleged a close fit between her complaints and violation of the public policy against conflicts of interest related to use of government money.

C.  Plaintiff's wrongful discharge claim is not precluded by existing remedies.[4]

_____

[3]     But even if we accept Defendant's argument, its assertion that she "does not allege she complained to Sonti or anyone else that UNF should have submitted a conflict-of-interest disclosure to USAID or another agency is belied by ¶ 127 of the SAC where Plaintiff explicitly addresses her failed efforts to have the consultants sign a conflict of interest statement.

[4]     To the extent that the Court distinguishes the instant matter from the *Myers* opinion and others by finding that Plaintiff has not sufficiently identified a public policy to serve as the basis for her wrongful discharge claim or that her wrongful discharge claim is precluded by either the

Defendant argues that Plaintiff's ability to bring a wrongful discharge claim is precluded by the statutory remedies that may available to her under the FCA and under the NDAA. *See* MTD 14-15. Defendant misstates the relationship between wrongful discharge claims and the availability of statutory remedies that may also be separately available to a plaintiff. This Court dealt with precisely this issue in deciding Howard University's first motion to dismiss in *Clay v. Howard Univ.,* 82 F. Supp. 3d 426 (D.D.C. 2015) ("*Clay I*").

In *Clay I*, this Court found that "extension of the exception is not appropriate where a statute or regulation provides a cause of action separate and apart from the tort of wrongful discharge." *Id.* at 431; *see also Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2008) (providing, "[T]he exception is unavailable *where the very statute creating the relied-upon public policy* already contains a specific and significant remedy for the party aggrieved by its violation.") (emphasis added).

In its opinion from *Clay I*, this Court went on to discuss a number of cases which illustrate the point. For example, a plaintiff cannot allege as the underlying public policy to a wrongful discharge claim a violation of the Age Discrimination in Employment Act ("ADEA") because the ADEA contains its own remedial scheme. *See Emory v. United Air Lines, Inc.,* 821 F.Supp.2d 200, 239 (D.D.C.2011). For the same reason, a plaintiff cannot allege as the underlying public policy to a wrongful discharge claim a violation of Title VII. *See Lockhart v. Coastal International Security,* 5 F. Supp. 3d 101, 106 (D.D.C. 2013) (stating, "an important

---

FCA or NDAA, Plaintiff would seek leave from the Court to amend her complaint to allege her disapproval to provide false information to USAID regarding unallowable expenses constitutes a refusal to engage in illegal activity as contemplated by 18 U.S.C. § 1001. § 1001 makes it a criminal act to knowingly and willfully "falsify, conceal, or cover up by any trick, scheme, or device a material fact." Of course, plaintiff will need to distinguish her allegations from *Alibalogun v. First Coast Sec. Sols*., Inc., 67 F. Supp. 3d 211 (D.D.C. 2014) (dismissing the plaintiff's wrongful termination claim because she only alleged termination for a "false reason" but leaving open the possibility if supported by the facts set out in the complaint).

limiting principle is that a plaintiff may not seek relief under a theory of wrongful discharge *based upon a statute that carries its own remedy* for violation.") (emphasis added); *see also Hoskins v. Howard Univ.,* 839 F. Supp. 2d 268, 281 (D.D.C. 2012) (anti-retaliation provisions of Title VII and DCHRA "*provide their own express remedies* for such misconduct and therefore cannot serve as predicates for a common law wrongful discharge claim") (emphasis added). The same is true when a plaintiff alleges a violation of the D.C. Whistleblower Protection Act as the underlying public policy to a wrongful discharge claim. *See Mpoy v. Fenty,* 870 F. Supp. 2d 173, 185 (D.D.C. 2012).

Defendant's brief makes the mistake avoided by this Court in *Clay I* by assuming that, because a plaintiff's wrongful discharge claim involves – to one degree or another - the same nucleus of facts as her other statutory claims, that she is somehow precluded from asserting a claim in tort. For example, Defendant cites to *Elemary v. Philip Holzmann, A. G.,* 533 F. Supp. 2d 116, 136 (D.D.C. 2008). While it is true that the court dismissed plaintiff's wrongful discharge claim, it did so because the plaintiff "identifie[d] the False Claims Act as the statute embodying the public policy violated in her case." *Id.* As noted, the FCA has its own statutory remedy and the court was correct to find that the FCA, alone, could not serve as the underlying basis for a wrongful termination claim.

Courts in other jurisdictions, such as neighboring Virginia, have found that "the same conduct or occurrence can support more than one theory of recovery." *Mitchem v. Counts*, 259 Va. 179, 187, 523 S.E.2d 246, 250 (2000). In *Mitchem*, the Plaintiff claimed she was wrongfully discharged after she refused a sexual relationship with her former employer. *See id.* at 183. The court found that since the Plaintiff identified a public policy as the basis for her wrongful termination claim other than the state's Human Rights Act, the fact that the state's Human Rights

Act covered the same conduct did not preclude the plaintiff from bringing a wrongful discharge on the basis of other public policies. *See id.* at 186.

Like in *Mitchem*, Plaintiff does not allege wrongful discharge under the FCA[5] or under the NDAA; instead Plaintiff alleges wrongful discharge under a public policy articulated by multiple federal regulations. None of the statutes or regulations Plaintiff identifies as the basis for her wrongful discharge claim has its own remedies for retaliatory termination. All do establish that conflicts of interest related to use of government money (and retaliation for disclosures regarding the same) are against D.C. public policy, and individuals who make disclosures about those public policies ought to be protected by availing themselves to claims in tort.

Numerous D.C. courts have recognized that, particularly in this city, this is an important public policy to protect. Plaintiff then *separately* alleges retaliation under the FCA. Dominated by government contractors and grantees, the District of Columbia is unique in terms of the number of employees whose job depends in one way or another on government funds. Taken to its logical conclusion, Defendant's argument would allow the NDAA or, perhaps to a lesser extent, the FCA to swallow wrongful termination claims as defendants could almost always find some regulation that touches on any of the proscribed conduct under the broadly defined prohibitions set forth by NDAA.[6] To accept such an argument would divest the D.C. citizens,

---

[5]     Defendant incorrectly states that Plaintiff lists her complaints about conflicts of interest under her FCA retaliation claim. *See* Mot. Dismiss, 14; *see also* Second Am. Compl. ¶ 151(e).

[6]     Such broadly defined terms include, "an abuse of authority," a "gross waste of funds," or "a substantial and specific danger to public health" related to a government contract. *See* 41 U.S. Code § 4712.

legislature, and courts of the authority to determine what is and is not an important public policy in their own city.

## V.   PLAINTIFF'S DISCRIMINATION CLAIMS[7] ARE SUPPORTED BY ALLEGATIONS THAT LEAD TO AN INFERENCE OF DISCRIMINATION.[8]

### A.   Plaintiff's allegations establish that Defendant's failure to hire her into the Director level position are sufficient to give rise to an inference of discrimination.

To bring an actionable failure-to-hire discrimination claim, a plaintiff must establish that: (i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *see also Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1149–50 (D.C. Cir. 2004).  "A plaintiff must show that his rejection is not attributable to 'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought."  *Stella v.*

---

[7]     For the purposes of this Opposition, Plaintiff refers to Counts III (DCHRA – Race Discrimination), V (Title VII – National Origin/Race Discrimination), and VI (Title VII – Sex Discrimination) as her "Discrimination Claims."  Because Defendant's motion aggregates Plaintiff's Discrimination Claims under the same heading, Plaintiff responds in kind for the ease of the Court's review.  Plaintiff does not contend that her Discrimination Claims need to all stand or fall together.

[8]     Due to their similarities, courts frequently turn to Title VII when interpreting the DCHRA. *See e.g., Tressler v. Nat'l R.R. Passenger Corp*., 819 F. Supp. 2d 1, 5 (D.D.C. 2011)("DCHRA and Title VII discrimination claims are analyzed under the same legal standard"); *Grandison v. Wackenhut Servs.,* Inc., 585 F. Supp. 2d 72, n.7 (D.D.C. 2008) ("Employment discrimination claims under the D.C. Human Rights Act are analyzed using the same legal framework as federal employment discrimination claims."); *Hollins v. Fed. Nat'l Mortg. Ass'n,* 760 A.2d 563, 571 (D.C. 2000) ("In considering claims of discrimination under the DCHRA, we employ the same three-part, burden shifting test articulated by the Supreme Court for Title VII cases. . .").  Accordingly, any references to cases dealing with Title VII apply with equal force to those dealing with the DCHRA.

*Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002) (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977)).  "Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Teamsters*, 431 U.S. at 358 n. 44 (1977).

Plaintiff has sufficiently alleged that Defendant's rejection of her application and the hiring of McDermott constitutes unlawful discrimination under Title VII and the DCHRA.  On June 30, 2014, Plaintiff applied for a Director-level position with Defendant but did not receive a response to this application. SAC ¶ 45.  Instead, Defendant contacted Plaintiff and asked her to interview for a Compliance Officer position, one below that of Director.  *Id.* ¶ 46.  Once she began working at UNF, Plaintiff learned that UNF had hired McDermott, a Caucasian male, for the Director-level position for which Plaintiff applied. *Id.* ¶ 50-1.  McDermott never worked for a non-profit and had no experience handling government funds prior to his employment with Defendant. *Id.* ¶ 52.  Conversely, Plaintiff, a black female from Kenya, holds a Master's degree, has had extensive training in management of federal awards, and has had years of experience with nonprofit organizations.

It is undisputed that Plaintiff is a member of a protected class and applied to a job for which the Defendant was seeking applicants. *Id.* ¶ 2, 5.  Plaintiff has, therefore, met the first two requirements of the *McDonnell Douglas prima facie* test.  Defendant rejected Plaintiff for the Director-level position, *id.* ¶ 6, and, further, as alleged in her complaint, Plaintiff was at least as qualified – and likely more so – for the Director level position as McDermott. *Id.* ¶ 52-3.  Thus, Plaintiff has alleged that her rejection was not due to an "absolute or relative lack of qualifications or the absence of a vacancy in the job sought."  *Stella,* 284 F.3d at 145.  Accordingly, she has met the third requirement of the *McDonnell Douglas* test.  Plaintiff has

further alleged that Defendant, having rejected her application, continued seeking applicants insofar as Defendant hired McDermott into the position. SAC ¶ 50.[9] Accordingly, Plaintiff has satisfied each of the four elements of the *McDonnel Douglas* framework.

But Plaintiff has alleged even more that gives rise to an inference of discrimination. Though she is under no requirement to do so, Plaintiff has identified McDermott, a Caucasian male, as the person selected for the position to which she applied. *See Stella,* 284 F.3d at 145 ("The District Court's holding that Ms. Stella was required to show that the SES positions were not filled by women finds no support in *McDonnell Douglas*."); *see also O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (finding the requirement that a "plaintiff was replaced by someone outside the protected class" is not a "proper element of the *McDonnell Douglas prima facie* case."); *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 347 (3d Cir.1999) ("a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that she was replaced by someone outside the relevant class"). In addition, Plaintiff has established other indicia of discrimination in the selection process: At the time of Plaintiff's hire, all other BSBR employees were Caucasian. SAC ¶ 54. At least three colleagues told her that they were "shocked that a black person was hired into the BSBR department," and one told Plaintiff that "the BSBR department does not usually hire people like you," or words to that effect *Id.* ¶ 55-6. Of Burton's five reports, Plaintiff was the only non-Caucasian and the only one who did not hold the title of "Director." *Id.* ¶ 90. All of these allegations further establish indicia of discrimination.

Defendant offers two untenable arguments in the face of Plaintiff's clearly stated allegations. First relying on out-of-circuit case law from the Northern District of New York,

---

[9]   If not explicitly stated in her complaint, this is implicit in the notion that Plaintiff applied for a job which was open to new applicants. Had the position already been filled, it is easily inferred that UNF would have taken the posting down.

Defendant cites to *Sulehria v. New York*, No. 1 :12-CV-00021 LEK, 2012 WL 4911424, at *2 (N.D.N.Y.Oct. 15, 2012) as support for its contention that Plaintiff's experience in non-profits and management of federal awards is immaterial because she has failed to allege that such skills were important to the Director position for which she was rejected. *See* MTD at 17.  In *Sulehria,* the applicant held an LL.M but sued the state for its failure to select him for positions wholly unrelated to his legal education: Employment Specialist, Supervisor Correctional Facility, Labor Services Representative, Human Rights Specialist, and Correction Officer Trainee. *See Sulehria,* 1 :12-CV-00021 LEK at Dkt. No. 8 (attached hereto as Exhibit 1).  Clearly, none of these positions require an LL.M.  The decision in *Sulehria* is as unremarkable as it is applicable to Plaintiff's case.  Defendant presumably would not take the position that, for example, experience managing federal grants is immaterial to a position that would require that the person serve as the financial manager for a $20,000,000 government grant. SAC ¶ 58.  Accordingly, the Court should give Defendant's argument on this score no weight.

Unsupported by any case law,  Defendant next takes the extraordinary position that inviting an applicant to apply for a lower position and one with less pay is somehow a panacea against claims of discrimination.  If this were true, a defendant could argue that there is no discriminatory intent when a company demotes an employee, because, to paraphrase Defendant's motion, the company could simply not have offered the employee the lesser job.  Instead, it could have filled the lesser job with a white male candidate who was not from Kenya.  *See* MTD at 19.  Regardless, Defendant's argument on this score is beside the point and has no bearing on whether Plaintiff met her burden to overcome a motion to dismiss.

      B.    <u>Plaintiff sufficiently alleges that Defendant's termination of her was based on her protected class(es).</u>

Over the years, courts have modified the traditional *McDonnell Douglas* framework to "accommodate the wide variety of employment discrimination claims that extend beyond the typical 'failure –to-hire' situations." *Teneyck*, 365 F.3d at 1150. Accordingly, the Court of Appeals for the D.C. Circuit has established that a plaintiff can meet her *prima facie* burden by showing: (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella*, 284 F.3d at 145; *see also Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185, 191 (D.D.C. 2013). In the context of a discharge claim, a plaintiff establishes a *prima facie* case by showing that the discharge was not attributable to the two common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citing 1 Lex K. Larson, Employment Discrimination § 8.08[4] (2d ed.2005)).

In the instant case, Plaintiff's SAC addresses each of the reasons for discharge cited in *George*. As alleged in her complaint, Burton told Plaintiff that he and Defendant were pleased with Plaintiff's work only a few months prior to her termination. SAC ¶ 69. Further, an HR representative told Plaintiff at her termination meeting that her performance was not in question. *Id.* ¶ 142. As for the second reason from *George*, the Defendant, as alleged in Plaintiff's complaint, did not eliminate her position. Rather, it reposted her position shortly after her termination. *Id.* ¶ 143. Furthermore, all of the indicia of discrimination discussed *supra* with respect to her failure to hire claim apply with equal force to her discharge claim.

Defendant's only challenge on this front is the fact that Plaintiff interviewed with Burton and others and, because the people who hired Plaintiff knew her to be a black female from Kenya, those same people could not possibly have discriminated against her. *See* MTD at 20

23

(citing *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)).  Not only does Defendant overstate the impact such a fact would have on her claim (if true), Defendant, as discussed *infra*, fails to recognize that, at the motion to dismiss phase, the plaintiff – not the defendant – is permitted to have inferences drawn in her favor.

Turning to the allegations set forth in Plaintiff's SAC, she makes clear that McDermott was part of her chain of command but was not a party to the hiring committee responsible for interviewing and hiring plaintiff.  This, alone, vitiates the purported "same actor inference" argued by Defendant.  *See* MTD at 20.  Furthermore, an employer cannot escape liability where the discriminatory employment action took place as a result of an employer's discriminatory animus.  *Staub v. Proctor Hosp., 562 U.S. 411, 422* (2011).  It is clear from her allegations that McDermott did not like Plaintiff. *See* SAC ¶ 64 ("McDermott's face was red and it appeared that he may have been offended"); ¶ 86 ("McDermott tried to pass the blame onto Plaintiff for McDermott's lack of knowledge").  Cortés recognized as much, telling Plaintiff, "Corinne, watch your back. He's after you." *Id.* ¶ 87.  Thus, even if the Court ignores the fact that Plaintiff has sufficiently met her pleading burden and gives weight to Defendant's purported "same-actor inference," the Court could just as easily infer that McDermott was "after" Plaintiff and McDermott's actions led to her termination.

More directly, the case law is illustrative of why Defendant is not entitled to the so-called "same actor inference" at the motion to dismiss stage.  The *Vatel* case cited by Defendant was decided on a motion for summary judgment and not on a motion to dismiss.  With respect to this rule, the court in *Waterhouse v. D.C.,* 124 F. Supp. 2d 1, 12 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002) endorsed the 11th Circuit's reasoning that "where same individual was responsible for hiring, promoting, and ultimately terminating plaintiff, these facts *may* give rise

*to a permissible inference* that no discriminatory animus motivated defendant's actions" *Id.* (citing *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir.1998)).  Of course, this *might* be an inference in favor of the Defendant after discovery has concluded and on a motion for summary judgment, but Defendant's attempt to avail himself of such a permissible inference on a motion to dismiss runs contrary to the established rule that all inferences are to be drawn in favor of the plaintiff when deciding a motion to dismiss. *Rattigan*, 503 F. Supp. 2d at 67.

Because Plaintiff has met her burden to overcome a motion to dismiss and because Defendant's only argument against her claim is based on a misunderstanding of procedural posture, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss her Discrimination Claims.

## VI.    PLAINTIFF HAS PROPERLY PLED "PROTECTED ACTIVITY" AS IT RELATES TO HER RETALIATION CLAIMS.[10]

Defendant's only challenge to counts IV and VII of Plaintiff's SAC is that she "does not plausibly allege she engaged in 'protected activity.'" *See* MTD at 21.  As discussed more fully below, Plaintiff engaged in unambiguous protected activity when she complained to HR about "disparate treatment."  But even if the Court finds to the contrary, recent Supreme Court precedent, opinions from various federal courts, as well as the latest guidance from the E.E.O.C. provide that this is not the end of the inquiry.  Rather, a plaintiff can survive a motion to dismiss where the defendant *perceives* the plaintiff as having engaged in protected activity.  Resolving all inferences in favor of the plaintiff, the Court should conclude that Plaintiff has set forth allegations sufficient to meet her burden at the motion to dismiss phase.

A.  Plaintiff engaged in unambiguous protected activity.

---

[10]      For the purposes of this Opposition, Plaintiff refers to Counts IV and VII as her "Retaliation Claims."

"Title VII and the D.C. Human Rights Act prohibit retaliation against an employee who 'opposed any ... unlawful employment practice,' or 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' related to the unlawful employment practice of the employer." *Akonji v. Unity Healthcare, Inc.,* 517 F. Supp. 2d 83, 94 (D.D.C. 2007) (citing 42 U.S.C. § 2000e-3(a); D.C. Code § 2-1402.61(b) (2001)).  To establish a claim of retaliation, a plaintiff must first establish that she engaged in a protected activity. *Id.* "Protected activity need not take the form of a lawsuit or of a formal complaint to an enforcement agency such as the EEOC or the OHR. On the contrary, the protections of Title VII extend to an employee's informal complaints of discrimination to his or her superiors within the organization." *Carter-Obayuwana v. Howard Univ.,* 764 A.2d 779, 790–91 (D.C. 2001).  "The employee need not, however, employ any 'magic words' such as 'discrimination,' for the communication of a complaint of unlawful discrimination ... *may be inferred or implied from the surrounding facts.*" *Id.* (internal citations omitted) (emphasis added).  "Courts have not imposed a rigorous requirement of specificity in determining whether an act constitutes 'opposition' for purposes of [the opposition clause]." *Id.* citing *E.E.O.C. v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983).  Indeed, determining whether an employee engaged in Title VII protected activity is subject to a "lenient standard." *Id.*

In the matter before the Court, Plaintiff engaged in clear protected activity.  She complained in writing to Somerville, a human resources professional, that she was facing "disparate treatment." SAC ¶ 92; MTD at Ex. 1.  Somerville informed Burton of Plaintiff's complaint.  SAC ¶ 100.  All of the employees in the BSBR department were Caucasian. SAC ¶ 54.  The colleagues that she identified as comparators in her complaint to HR were also all Caucasian, as was the manager about whom she was complaining. SAC ¶ 90.  In her complaint,

Plaintiff talks in unambiguous terms about how her qualifications and job duties are equal to that of those same colleagues, yet her title is not commensurate with that of her colleagues.  SAC ¶ 92.  She questions why she was not selected for the Director of Budgets position when the selectee (McDermott, Caucasian) lacks the "basic knowledge required for him to perform his everyday duties."  MTD at Ex. 1.  And, despite Defendant's protestations to the contrary, Plaintiff explicitly states that she is "not complaining about [her] duties."  *Id.*   Taken as a whole and resolving all reasonable inferences in her favor, Plaintiff's claims clearly meet the "lenient standard" to which her protected activity is subject.

   B.   <u>Defendant's cited case law illustrates why Plaintiff's disclosures should be deemed protected.</u>

   Defendant spends much of its argument discussing why, for example, the use of mere "magic words" are insufficient to trigger the protections afforded by the anti-retaliation provisions of Title VII and the DCHRA.  *See* MTD at 21 (citing *Middlebrooks v. Godwin Corp., 722 F. Supp. 2d 82, 89 (D.D.C. 2010), aff'd, 424 F. App'x 10 (D.C. Cir. 2011)).  Plaintiff has no argument with the court's decisions in *Middlebrooks* or *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 144 (D.D.C. 2014) as each are wholly distinguishable from the instant matter.  In the *Middlebrooks* case, the court dismissed the plaintiff's complaint for lack of protected activity, finding that "none of the plaintiff's alleged complaints concerned discrimination based on race or color."  *Middlebrooks,* 722 F. Supp. 2d at 89.  In that case, the plaintiff's alleged protected activity consisted of:

   > "[P]rotesting the unfair treatment rendered toward D.C. Healthy Start clients" (Compl. ¶ 110); "reporting unsafe health care practices and for reporting unauthorized healthcare practices" (*id.* ¶ 111); "reporting inappropriate touching behavior and inappropriate groping behavior bestowed upon a D.C. Healthy Start client" (*id.* ¶¶ 112–113, 117–118); and for reporting unsafe practices and illegal activity (*id.* ¶¶ 114–116.)

*Id.* Plaintiff agrees with the court's dismissal in that case as there is nothing at all in the plaintiff's alleged protected activity implicating discrimination or disparate treatment on the part of the employer. The same is true for Defendant's citation to *Hajjar-Nejad*, which, as discussed more fully below, was decided on a motion for summary judgment and not on a motion to dismiss. There, the alleged protected activity consisted of three statements:

(i)     The plaintiff wrote of his supervisor, "[h]er tone, manner and actions are very unprofessional and coercive;"

(ii)    The plaintiff "requests the overturning of the evaluation by the Department of Medicine and, more importantly and essentially, for the creation of an active task force committee composed of students, administrators, deans, and hospital officials for the coordination and implementation of our goals and objectives as spelled out so explicitly in the University strategic plan;" and

(iii)   A document that "discuss Plaintiff's claims of procedural errors in his dismissal from the Medical School," to which the plaintiff had attached a 21 page document containing, but apparently not referencing, a brief paragraph regarding the defendant's policies on discrimination. *Hajjar-Nejad*, 37 F. Supp. 3d at 144-45.

Such cases are a far cry from the instant matter where Plaintiff, the only black woman in an entirely Caucasian department, complained explicitly about "disparate treatment." SAC ¶ 54, 90-92. This is especially true in light of the requirement that protected activity may be inferred or implied from the surrounding facts. *Carter-Obayuwana*, 764 A.2d at 791. Based on the above, Defendant's cited authority is so dissimilar from the circumstances of the instant case that it should be disregarded entirely.

C.      Defendant's reliance on cases decided at summary judgment is inappropriate in light of the more lenient standard applied at the motion to dismiss phase.

Compounding the failures to Defendant's argument is its reliance on cases decided on

summary judgment as opposed to on a motion to dismiss, and Defendant's implicit assertion that

the opinions arising from the former weigh equally when deciding cases based on the latter.

Defendants cite to *Hunter v. D.C.*, 797 F. Supp. 2d 86, 93 (D.D.C. 2011) as standing for the

proposition that mere inclusion of the word "discriminatory" is insufficient to establish protected

activity. *See* MTD at 23.  But the *Hunter* decision was based on a motion for summary judgment

and not a motion to dismiss.  *See Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d

152, 159 (D.D.C. 2010).  The District Court, prior to granting the defendant's motion for

summary judgment, denied its motion to dismiss with respect to the discrimination and

retaliation claims asserted by the Plaintiff.  *Id.* In so doing and as is relevant here, the District

Court noted:

> The [defendant] points to cases finding, on summary judgment,
> that paid leave with the requirement to take a fitness for duty
> exam, standing alone, does not constitute a materially adverse
> action… *Unlike those cases, however, the [defendant] has filed a
> motion to dismiss before any discovery.*

*Id.* at 159 (emphasis added).  Recently in *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163

(D.C. Cir. 2015), the Court of Appeals for the D.C. Circuit discussed the *Hunter* decisions and

the "critical difference" between motions for dismissal and for summary judgment:

> As to the harms flowing from the fitness for duty exam, the three
> successive decisions in the case originating as *Hunter v. District of
> Columbia Child and Family Services Agency,* 710 F.Supp.2d 152
> (D.D.C.2010), illustrate the critical difference between motions for
> dismissal and for summary judgment. In the initial decision, the
> district court found that an allegation of a mandatory fitness for
> duty examination was "sufficient to withstand the ... motion to
> dismiss," insofar as "[t]he circumstances of this case are not
> known at this time because no discovery has taken place."  Only
> after the parties had the opportunity for discovery did the court
> find that imposition of the exam was not materially adverse,

29

granting summary judgment and dismissing as "unsupported"
plaintiff's general assertion that the exam impacted him
"physically, mentally and financially, manifesting itself in
insomnia, and anxiety."

*Id.* at 163 (internal citations omitted).  Though the plain words of Plaintiff's complaint constitute

protected activity, the extent to which Defendant and Defendant's HR department reacted to

Plaintiff's complaint could lend further credence to her argument that her statements were

protected.  Plaintiff should be permitted to take discovery on these issues.

> D.    A reasonable inference can be drawn that Defendant perceived that Plaintiff
>       engaged in protected activity, and she should be permitted to take discovery to
>       confirm such a perception exists.

Though Plaintiff asserts that her December 11, 2014, complaint to Somerville was clear

and unambiguous protected activity, the inquiry as to whether Plaintiff has satisfied the first

prong of her *prima facie* case must also examine the employer's perception of that complaint.

Courts around the country have held that "employer's discharge of an employee for

discriminatory reasons amounts to illegal retaliation even if it is based on the employer's

mistaken belief that the employee engaged in protected activity."  *Fogleman v. Mercy Hosp.,*

*Inc.,* 283 F.3d 561, 571 (3d Cir. 2002); *see also Braddock v. SEPTA*, No. CV 13-6171, 2016 WL

1182098, at *5 (E.D. Pa. Mar. 28, 2016) (providing, "[T]here remains a disputed genuine issue

of material fact with respect to whether [defendant] perceived that [plaintiff] was engaging in

protected activity during the phone call. On these facts, I cannot as matter of law find that

[plaintiff] did not engage in protected activity as perceived by his supervisor."); *see also*

*Middleton v. Douglas County,* No. 8:12-cv-00019, slip op. at 18 (attached as Exhibit 2) (finding

retaliation based on an employer's perception of an employee's intent).  Only two weeks ago and

in a similar vein, the E.E.O.C. issued guidance on anticipatory retaliation which provides that an

employee could be protected from retaliation even where he or she has not engaged in protected

activity. *See EEOC Enforcement Guidance on Retaliation and Related Issues,* No. 915.004 at FN

4 (August 25, 2016) (citing *Beckel v. Wal-Mart Assocs., Inc.,* 301 F.3d 621, 624 (7th Cir. 2002)

and *Sauers v. Salt Lake Cty.,* 1 F.3d 1122, 1128 (10th Cir. 1993)) (available at

(https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm#_ftn4).

    In April 2016, the Supreme Court adopted this notion of perceived protected activity in

deciding *Heffernan v. City of Paterson*, 578 U.S. ___(2016) (attached as Exhibit 3).  To briefly

summarize the facts, the plaintiff, at the behest of his bedridden mother, obtained a campaign

yard sign to be posted on her lawn.  A colleague witnessed the plaintiff, a government employee,

with the political sign and informed plaintiff's supervisor, a proponent of the opposing candidate,

of his perception that plaintiff supported the opposing candidate.  *Id.* at 2.  Immediately

thereafter, the defendant demoted the plaintiff. *Id.*  The Supreme Court astutely noted that a court

should ask, "Is it a right that primarily focuses upon *(the employee's) actual activity* or a right

that primarily focuses upon *(the supervisor's) motive*, insofar as that motive turns on what the

supervisor believes that activity to be?"  *Id.* at 4.  Ultimately, the Supreme Court concluded: "If

the employer's motive (and in particular the facts as the employer reasonably understood them)

is what mattered in *Waters*, why is the same not true here?... We conclude that… *the*

*[defendant's] reason for demoting [plaintiff] is what counts here.*" *Id.* at 6 (emphasis added).

    Turning back to the matter before the Court, the *Heffernan* case, coupled with reasoning

in cases like *Fogleman* and *Braddock* as well as the E.E.O.C.'s recent guidance, makes clear that

a court is permitted to, and indeed should, look beyond the exact words used (or not used) in

evaluating a plaintiff's claim of retaliation.  Though the precise language employed by a plaintiff

is relevant and should be analyzed, the over-riding inquiry is whether or not the defendant's

reason for an adverse employment action was because the defendant perceived the plaintiff as

having engaged in protected activity.  It is perfectly reasonable to infer – as a Court must on a motion to dismiss – that Somerville, an experienced HR professional who is undoubtedly well-versed in employment discrimination law, read Plaintiff's complaint about "disparate treatment" as a complaint protected by Title VII and the DCHRA.  Plaintiff should, therefore, be permitted to take discovery on this issue to learn more about Somerville's and Defendant's perception of Plaintiff's complaint and any associated investigation thereof.  Therefore, with inferences drawn in Plaintiff's favor, she should withstand a motion to dismiss related to her retaliation claims.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss in total and allow her to take discovery on the issues presented in her Second Amended Complaint.

Dated: September 9, 2016                     Respectfully Submitted,

_____/s/_____

R. Scott Oswald, DC Bar No. 458859
Andrew M. Witko (*pro hac vice* to be filed)
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
awitko@employmentlawgroup.com
*Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via ECF,

on this 9th day of September, upon:

Deborah P. Kelly (Bar No. 420715)
David T. Schur (BarNo. 473990)
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

***Attorneys for Defendant United Nations Foundation***


_____/s/_____
R. Scott Oswald