# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **Corrine Omwenga,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 15-cv-786 (TSC)** |
| | ) | |
| **United Nations Foundation** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

In this employment discrimination and retaliation action, Plaintiff Corrine Omwenga alleges eight claims against The United Nations Foundation (UNF), her past employer: (1) violation of the anti-retaliation provision of the Federal False Claims Act (FCA); (2) common law wrongful termination in violation of District of Columbia public policy; (3) discrimination under the District of Columbia Human Rights Act (DCHRA); (4) retaliation under DCHRA; (5) discrimination based on National Origin/Race under Title VII of the Civil Rights Act of 1964 (Title VII); (6) discrimination based on sex under Title VII; (7) retaliation under Title VII; and (8) whistleblower retaliation under the National Defense Authorization Act (NDAA).

UNF has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion will be GRANTED in part and DENIED in part.

# I. BACKGROUND[1]

## A. Omwenga's Hiring

Omwenga is a black woman from Kenya who was employed by UNF as a compliance officer from August 4, 2014 until she was terminated on February 18, 2015. *See* Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp. to Def.'s SOF"), ECF No. 46-1 ¶¶ 2, 20, 92.

Before Omwenga's employment at UNF, she applied for a newly created position, Director of Business Services and Budgets, but she was never interviewed. *See id.* ¶ 11. Instead, UNF hired Andrew McDermott, a white male. *See id.* ¶ 17. UNF contends that McDermott was interviewed based on the experience on his resume and hired because of his "superior performance" during his interview. *Id.* ¶¶ 15, 17. UNF further argues that Omwenga was not interviewed for the position because David Burton, Executive Director of Budgets for the UNF, felt she lacked the required qualifications, such as a "heavy budgets and enterprise-level kind of view," which he sought in a prospective director. *Id.* ¶¶ 11, 12. Omwenga disputes this contention by (1) pointing to individuals who were hired without meeting the minimum requirements for positions, (2) noting that the Executive Director had access to Omwenga's resume, which divulged her national origin, and (3) claiming that all other candidates who were interviewed and rejected for the director position had more experience than McDermott, but were women or minorities. *See id.* ¶¶ 11, 12, 16.

Although Omwenga was not interviewed for the director-level position, she was offered an interview for the compliance officer position, for which she was ultimately hired, at a salary higher than initially advertised. *Id.* ¶¶ 18–21.

---

[1] The facts are undisputed by the parties unless otherwise noted.

### B. Omwenga's Job Responsibilities

As a compliance officer, Omwenga's job was to "ensure that projects receiving [United States Government (USG)] funding were fully compliant with the rules and regulations governing the use of USG funds." *Id.* ¶ 24. Compliance officers also performed internal audits of the government-funded projects, monitored project reporting requirements, provided technical assistance when monitoring the government grants, and raised compliance concerns about the government grants. *See id.* ¶¶ 25–29.

However, Omwenga disputes that all projects receiving USG funding were under her purview. *Id.* ¶ 24. In particular, she notes that she was not responsible for compliance of the Mobile Hub project. *Id.* On that project, her role was to assist Koki Hurley, the Grant Manager, with compliance. *See id.* ¶¶ 44–46; Plaintiff's Response to Defendant's Motion for Summary Judgment ("Pl. Resp. to Mot. Summ. J."), ECF No. 46, Ex. 20, Axelrod Dep. at 169:3–169:11; Defendant's Motion for Summary Judgment ("Def.'s Mot. Summ. J."), ECF No. 40, Ex. 14, Axelrod Dep. at 26–27.

### C. Complaints About Omwenga's Work Performance

Starting in late September 2014, some employees began complaining about a lack of clarity in Omwenga's e-mails and advice. Pl. Resp. to Def.'s SOF ¶¶ 47–48, Def.'s Mot. Summ. J., Ex. 20, UNF 809. They claimed that on several occasions, Omwenga would reference a statute or contractual clause without making the information accessible in laymen's terms. *See id.* ¶¶ 46–48. These complaints were brought mostly to Andrew Axelrod, the Executive Director of the Mobile Hub Project. *See id.* ¶¶ 24, 46–49; Def.'s Mot. Summ. J., Ex. 14, Axelrod Dep. at 149–150, Ex. 20, UNFs 824, 842, 846, 867, 897. Axelrod discussed Omwenga's performance and professionalism with Burton multiple times. *See* Pl. Resp. to Def.'s SOF ¶ 49; Def.'s Mot.

Summ. J., Ex. 14, Axelrod Dep. at 149–150, 161–164.  Plaintiff asserts that she was never informed of any complaints against her.  *See* Pl. Resp. to Def.'s SOF ¶¶ 52, 54–55.

On November 20, 2014, Omwenga had her 90-day review with Burton, during which he told her that she had successfully completed the introductory period.  *Id.* ¶¶ 50–51.  He also complimented her, stating that she "had done a good job coming into a new position at the Foundation and making it her own."  *Id.* ¶ 51; Pl. Resp. to Mot. Summ. J., Ex. 3, Burton Dep. at 145:6–145:19.  Burton contends that he was also trying to convey to Omwenga that she needed to improve her communication skills.  Pl. Resp. to Def.'s SOF ¶ 52.  Omwenga disputes that Burton discussed her communication skills, and there is no mention of the subject in the written summary of the review.  *Id.*; Pl. Resp. to Mot. Summ. J., Ex. 3, Burton Dep. at 147:5–148:3.

Other individuals started to complain about Omwenga in December 2014 and January 2015.  *See* Pl. Resp. to Def.'s SOF ¶ 54; Def.'s Mot. Summ. J., Ex. 20, UNF 965, 985.  Walter Cortes, UNF's Chief Financial Officer, stated that in December 2014 he started to believe that Omwenga was not performing her job well.  *See* Def.'s Mot. Summ. J., Ex. 13, Cortez Dep. at 29.  He noted that Omwenga interrupted speakers and raised her voice at meetings, traits that other coworkers had also mentioned.  *See id.* at 29–31.  Cortes also claimed that this was the only time in his ten years at UNF that he could recall an employee complaining about another employee's conduct.  *See id.* at 96–98.  Around the end of 2014, the head of Human Resources, Maxine Somerville, was notified about Omwenga's performance and communication problems.  *See* Pl. Resp. to Def.'s SOF ¶¶ 60–61.  Omwenga was not informed about these problems.  *See id.*

Omwenga alleges that she engaged in protected activity when she investigated UNF's alleged fraudulent activities and that she was terminated because of this activity. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9. She proffered five instances of protected activity:

- (1) on December 5, 2014, she e-mailed Camila Campo, Cortes, and Burton about "unallowable transactions" on a sub-award contract;

- (2) in early December 2014, she notified McDermott and Campo about unallowable postings regarding "transactions to projects whose award documents were not issued yet";

- (3) on January 29, 2015, she "requested documentation" from Koki Hurley, Cortes, and Burton "to justify $124,000 in unallowable expenses charged to USAID";

- (4) in late January, she gave Burton a document titled "fraud indicators" which displayed a number of UNF's activities that "fell within the definition of fraud"; and

- (5) on February 4, she met with Burton and Lara Sonti, Senior Director for Business Services and Contracts, to discuss "concerns about UNF's project teams posting unallowable charges on the contract with USAID." *Id.*

During the week of February 2, 2015, Hurley and Omwenga had a lengthy e-mail exchange about how their roles coexisted on compliance issues, as well as some missing documents. *See* Pl. Resp. to Def.'s SOF ¶ 63; Pl. Resp. to Mot. Summ. J., Ex. 30–31, E-Mail Exchange. Hurley told Burton that Omwenga was unhelpful, accusatory, and condescending. *See* Pl. Resp. to Def.'s SOF ¶¶ 62–65. On February 4, 2015, Burton and Richard Parnell, UNF's Chief Operating Officer, met to discuss the issue, as well as Omwenga's communication style

generally. *Id.* ¶¶ 67–72. Burton contends that the meeting was focused on ways to improve

Omwenga's communication style, not the compliance issues she had raised in the e-mail. *Id.*;

Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 230–234. Burton further contends that, other than

the issue of Omwenga's tone in the e-mails and the concerns he claims were voiced at her

performance review in November, UNF did not tell Omwenga to address problems with her

communication skills. *See* Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 229–234. In early

February, as a follow up to their meeting, Parnell told Burton to take Omwenga offsite to discuss

ways he could help her succeeded at UNF. *See* Pl. Resp. to Def.'s SOF ¶ 70.

Following the meeting between Burton and Parnell, Burton and Sonti took Omwenga to

lunch on February 3, 2015. *Id.* ¶ 71. Burton contends that the purpose of the lunch was to

explain to Omwenga that she could be useful to the Mobile Hub team, and that they did not

discuss the concerns Omwenga had raised in her e-mail exchange with Hurley. Ex. 26, Def.'s

Second Interrog. Resp. No. 15 at 1–3. Omwenga, however, claims that they talked about the

issues in the e-mail exchange, which included concerns about fraudulent charges and reporting

errors. *See* Pl. Resp. to Def.'s SOF ¶ 72. Omwenga also claims that, although Sonti was not

officially "in-house counsel," Omwenga viewed her as such because Sonti had a law degree and

was trained as a lawyer. *Id.* ¶ 72.

On February 4, 2015, Parnell spoke with Kawanna Jenkins in Human Resources to learn

more about Burton's "working relationship" with Omwenga. *Id.* ¶ 73. He explained to Jenkins

that "there are other[] [employees] who are complaining about working with [Omwenga]." *Id.*

¶ 74. After the meeting, and aware that employees had complained about Omwenga, Jenkins

suggested to Burton that Omwenga participate in communications coaching. *Id.* ¶¶ 74–76.

Burton claims that he did not follow up on this suggestion because he felt UNF reserved

coaching for people who would be receptive or would advance in the company, and he was

unsure if Omwenga met those criteria. *See* Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 283–87.

The UNF employee handbook indicates that "coaching" precedes disciplinary action and that

verbal counseling is the first formal disciplinary step in the "Conflict Resolution and Progressive

Discipline" guidelines. Pl. Resp. to Mot. Summ. J., Ex. 44, UNF handbook at 1. The handbook

guidelines note that, following verbal counseling, a "Written Warning, Decision-Making Leave,

and Investigation Suspension" were the appropriate steps in the disciplinary process. *Id*. at 1–2.

Omwenga did not receive any disciplinary action other than verbal counseling before she was

terminated.

On February 5, 2015, Burton spoke with Omwenga about her communication skills and

tone. Pl. Resp. to Def.'s SOF ¶ 78. In an e-mail to Jenkins, Burton noted that the meeting went

well, that Omwenga recognized that there were difficulties with the Mobile Hub team and she

had explained that she sometimes felt disrespected by the team, and that she had a good working

relationship with UNF's other teams. *Id.* ¶¶ 79–80; Def.'s Mot. Summ. J., Ex. 29, UNF 1417.

Omwenga and Burton agreed to go over talking points and tone suggestions before the next

Mobile Hub monthly meeting. Pl. Resp. to Def.'s SOF ¶¶ 81–83.

On February 11, 2015, Burton and Omwenga met before the monthly meeting to set

communication expectations. *Id.* ¶ 83. Burton claims that at the meeting Omwenga raised her

voice and did not communicate effectively, although he could not remember specifically what

she did or said. *See id.* ¶ 84; Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 297–300. Others at the

meeting also said that Omwenga was rude and condescending and interrupted Burton and

Hurley, forcing Burton to call a "timeout" at the meeting. Def.'s Mot. Summ. J., Ex. 30, Erbrick

Decl. ¶¶ 3–6. Burton, however, indicated it was a combination of Omwenga and McDermott's

comments that caused the "timeout." *See* Pl. Resp. to Def.'s SOF ¶¶ 84–89; Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 215:9–216:10.

The following day, Burton met with Jenkins and told her he wanted to fire Omwenga based on her behavior. Pl. Resp. to Def.'s SOF ¶ 90–91; Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 291–293. Omwenga disputes that Burton's decision was motivated by her behavior, noting that Nicolas Bacon, a UNF Executive Director, testified at his deposition that the only employee he could recall being terminated from UNF without it following the disciplinary policy in the employee handbook (or at least without a written warning) was an employee who engaged in years of bullying. *See* Pl. Resp. to Def.'s SOF ¶ 91. Omwenga also alleges that the termination conversation between Burton and Jenkins occurred the same day that Omwenga e-mailed Burton, Hurley, and McDermott about consultants' conflicts of interest and unallowable costs charged to USAID. *Id.* UNF terminated Omwenga on February 18, 2015. *Id.* ¶ 92.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute is "material" only when it involves facts "that might affect the outcome of the suit under the governing law." *Id.* In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . ' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. In response, the nonmoving party must "go beyond the pleadings" and identify specific facts which show there is a genuine issue for trial. *Id.* at 324. To preclude summary judgment, the nonmovant must "provide evidence that would permit a reasonable jury to find [in his favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

In evaluating a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. The court must "eschew making credibility determinations" at the summary judgment stage. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2017). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). "[C]onclusory assertions offered without any evidentiary support do not establish a genuine issue for trial." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 63 (D.D.C. 2016) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).

## III. ANALYSIS

### A. Discrimination Claims

Title VII's anti-discrimination provision prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The DCHRA anti-discrimination provision bars "discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression" as well as many other forms of discrimination. D.C. Code

§ 2.1401.01 *et seq.* "[I]t is well-established that the DCHRA and Title VII employment discrimination actions are evaluated under the same legal standard." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 58–59 (D.D.C. 2011).

Title VII and DCHRA claims may be proved by direct or circumstantial evidence. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Where, as here, a plaintiff has offered indirect evidence of Title VII discrimination, the court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether summary judgment is appropriate. Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802. In order to do so, a plaintiff must show that: (1) she belongs to a protected class under Title VII, (2) she experienced an adverse employment action, and (3) the adverse employment action yields an inference of discrimination. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008). If the plaintiff meets her burden of establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the relevant action. *Id.* at 144. If an employer proffers such a reason, the burden reverts to the plaintiff to demonstrate that the employer's purported justification for the adverse employment action was merely a pretext for unlawful discrimination. *Id.*

The D.C. Circuit has determined that the question of whether a plaintiff in a Title VII discrimination case actually established a prima facie case is "almost always irrelevant." *Brady*, 520 F.3d at 493. When "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case

under *McDonnell Douglas*." *Id.* at 494 (emphasis in original). The summary judgment analysis instead must focus on "one central question":

> Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* Recently, this Circuit clarified that *Brady's* singular focus on the "pretext" phase of the *McDonnell Douglas* analysis is merely a "shortcut" and does not "imply that the District Court may relieve the employer of its burden, at the second prong, to articulate a legitimate, nondiscriminatory reason for its action." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (internal quotation marks and citation omitted). For the *Brady* rule to apply, "an employer at the second prong must proffer admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *Id.* at 1092. The evidence the employer presents "must suffice to raise a triable issue of fact as to intentional discrimination and to provide the employee with a full and fair opportunity for rebuttal." *Id.*

The D.C. Circuit recently clarified four factors that, in most cases, determine whether an employer's evidentiary proffer is adequate: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) if the factfinder believes the evidence, it "must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation must be . . . facially credible in light of the proffered evidence"; and (4) the evidence must present a "clear and reasonably specific explanation" such that the employee has "a full and fair opportunity to attack the explanation as pretextual." *Id.* at 1087–88 (citations and quotation marks omitted).

UNF has met its evidentiary burden under the second prong of *McDonnell Douglas* and the *Figueroa* standard as to Omwenga's Title VII sex discrimination claim (Count VI), her Title VII racial/national origin discrimination claim (Count V), her Title VII retaliation claim (Count VII), her DCHRA discrimination claim (Count III), her DCHRA retaliation claim (Count IV) and her FCA retaliation claim (Count I).

First, because Omwenga has not objected to the admissibility of UNF's evidence in support of its motion for summary judgment, the court may consider this evidence. *Cf. Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) ("Rule 56 allows a party . . . opposing summary judgment to object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") (citing Fed. R. Civ. P. 56(c)(2)) (quotation marks omitted).

Second and third, a factfinder could reasonably conclude from the evidence that UNF was motivated by a nondiscriminatory and legitimate reason. *See Figueroa*, 923 F.3d at 1087. There is ample evidence that demonstrates Omwenga's unprofessionalism, poor communication skills, and lack of significantly superior qualifications for the director-level position. This is sufficient evidence for a factfinder reasonably to conclude that Omwenga's qualifications and performance were the reasons why she was not interviewed for the director-level position and was terminated.

Fourth, UNF has presented sufficiently clear and specific explanations for not interviewing Omwenga for the director-level position and for terminating her, such that she has had "a full and fair opportunity to attack [them] as pretextual." *Id.* at 1088. In addition, UNF has provided specific instances of Omwenga's alleged poor communication and professionalism, which "fairly put [her] on notice of what reasoning [she] must challenge," *id.* at 1091 (citing

*Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003)), and grant her a clear opportunity to refute UNF's claims.

Therefore, with respect to those six claims, the burden now reverts to Omwenga to demonstrate that UNF's proffered explanations were pretextual. *See Royall*, 548 F.3d at 144. Pretext can be shown "either directly by [showing] that a discriminatory [or retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

1. Director Position

UNF offers two non-discriminatory reasons for not interviewing or hiring Omwenga for the director-level position. First, it contends that it did not hire Omwenga because she did not meet the minimum qualifications, and she "admitted" to lacking baseline qualifications for the position. *See* Def.'s Mot. Summ. J., Ex. 1, Omwenga Dep. at 64. Second, UNF argues that even if Omwenga was qualified for the position, she was not significantly more qualified than McDermott or the other interviewed candidates to raise suspicions of discrimination. *See* Defendant's Statement of Facts ("Def.'s SOF") ¶¶ 14, 16.

Although a reasonable factfinder could conclude that Omwenga demonstrated she was qualified for the position, *see* Pl. Resp. to Def.'s SOF ¶ 5, private businesses have discretion with respect to whom they hire, and Omwenga can show that she was discriminated against only if a reasonable factfinder could conclude that she was "significantly" more qualified than McDermott, *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job" then the factfinder can "infer that the employer consciously selected a less-

qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination." *Id.*

UNF presented evidence that all the candidates they interviewed met the qualifications for the job posting and that many of these candidates were also minorities. *See* Def.'s SOF ¶¶ 14, 16. Omwenga, however, failed to provide evidence that would allow a reasonable factfinder to conclude that she was significantly more qualified than the hired candidate.

2. <u>Omwenga's Termination</u>

As with her hiring claim, Omwenga must show that UNF's proffered reasons for why she was terminated were pretextual. *See Royall*, 548 F.3d at 144.

Omwenga alleges that once she arrived at UNF, coworkers made nasty, rude, and unprofessional comments about her. *See* Pl. Resp. to Def.'s SOF ¶¶ 48, 54. These comments were primarily made by two employees, one of whom was Axelrod, an Executive Director, and the other was a member of the Mobile Hub team. *Id.* Although Omwenga contends that these comments show UNF's discriminatory animus, she fails to provide evidence that either of these employees was authorized to take adverse action against her. Without such evidence, the statements do not lead to a plausible finding that Omwenga's termination was motivated by discriminatory animus.

Therefore, summary judgment will be granted to UNF as to Omwenga's discrimination claims (Counts III, V, and VI).

**B. Title VII and DCHRA Retaliation Claims**

Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against [an] employee [] . . . because [s]he has opposed any practice" prohibited by Title VII or "has made a charge, testified, assisted, or participated in" a Title VII proceeding. 42 U.S.C.

§ 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). "The analysis of [a] claim of retaliation under Title VII applies equally to [a] claim under the DCHRA." *Cole v. Boeing Co*., 75 F. Supp. 3d. 70, 83 (D.D.C. 2014).

For Omwenga to prevail on her retaliation claim, she must "show: (1) that [she] opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). This third element means that Omwenga must show that she would not have been terminated but-for opposing a practice prohibited by Title VII. *See Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 67 (D.D.C. 2017) (holding that "[t]o demonstrate causation in a Title VII or DCHRA case, traditional principles of but-for causation apply") (internal quotation marks omitted).

As with discrimination claims, the court utilizes the *McDonnell Douglas* burden-shifting framework to analyze retaliation claims. *McGrath*, 666 F.3d at 1383. Similarly, at the summary judgment phase, and after the defendant proffers a legitimate, non-retaliatory reason for the adverse employment action, whether the plaintiff established a prima facie case is irrelevant. *See Cruz v. McAleenan*, 931 F.3d 1186, 1194 (D.C. Cir. 2019) (citations omitted); *Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007). Because the court has already found that UNF proffered legitimate, non-retaliatory reasons for the adverse employment action, the burden shifts to Omwenga to show that the proffered reasons were pretextual. *See Cruz*, 931 F.3d at 1193–95.

Omwenga alleges that she was fired because she told Maxine Somerville, the HR Director, that she was experiencing disparate treatment: she was the only employee and the only non-Caucasian reporting to Burton who did not have the title of director. *See* Pl. Resp. to Def.'s

SOF ¶ 37.  However, the only evidence that Omwenga proffers in support of her retaliation claim is the short period of time between when she raised her concerns and her termination.  *Id.*

Omwenga complained to Somerville on December 11, 2014.  *Id.* ¶ 37.  On January 7, 2015, Somerville spoke to Burton about the matter.  *Id.* ¶ 39.  A few weeks later, Omwenga e-mailed Somerville again to inform her that she had talked to Burton about her disparate treatment.  *Id.* ¶ 37.  Omwenga was terminated on February 18, 2015.  *Id.* ¶ 92.

Although alleging mere proximity may be enough to survive a motion to dismiss, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012), more is required at the summary judgment phase.  *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) ("Where . . . an employer has provided a legitimate, nonretaliatory reason for its employment action, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation is genuine.") (quotation marks and citation omitted).  Because Omwenga proffers no evidence beyond the close in time argument to substantiate her Title VII and DCHRA retaliation claims (Counts IV and VII), the court will grant UNF's motion for summary judgment as to these claims.

### C. FCA Retaliation Claim

Omwenga claims that UNF violated the FCA's anti-retaliation provision because she engaged in the aforementioned protected activity (Count I).  The anti-retaliation provision of the False Claims Act states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).  To establish a retaliation claim under the FCA, Omwenga must demonstrate "(1) that [she] engaged in protected activity ('acts done ... in furtherance of an action under [the FCA]'); and (2) that [she] experienced discrimination 'because of' [her] protected activity."  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422 (D.C. Cir. 2005) (quoting 31 U.S.C. § 3730(h)).  "Boiled down to its essentials, an FCA retaliation claim requires: (1) protected activity; (2) notice; and (3) adverse action taken in response to such protected activity."  *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015).

The court again uses the *McDonnell Douglas* burden-shifting framework to analyze the FCA retaliation claim.  *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1240–41 (D.C. Cir. 2012).  "Under *McDonnell Douglas*, an employee first must make out a prima facie case of retaliation," and "[i]f the employee does so, then the burden shifts to the employer to produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason."  *Id.* (internal quotation marks and citations omitted) (alteration in original).  Then, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."  *Id.* at 1241 (internal quotations marks omitted).

The court has already found that UNF has provided a sufficient non-retaliatory basis for Omwenga's termination.  Therefore, the only remaining issue is whether Omwenga has produced enough evidence such that a reasonable factfinder could infer retaliation; the evidence should raise "a material dispute on the ultimate issue of retaliation."  *Boone*, 64 F. Supp. 3d 216, 232 (D.D.C. 2014) (citation omitted). "[T]he Court must review each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they either separately or

in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Id.* (internal citations and quotation marks omitted).

On this "ultimate question, the prima facie case remains relevant, but only as part of the evidence the court considers." *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 294 (D.D.C. 2015) (citations omitted). Regarding the first of the three categories of evidence, as described below, Omwegna has established a prima facie case. The D.C. Circuit has interpreted "protected activity," the first element of a prima facie case, broadly. *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998). The second and third elements require "that the employer had knowledge of the employee's protected activity and that the retaliation was motivated by the protected activity." *Shekoyan*, 409 F.3d at 422. A plaintiff must also show that in disclosing the possible FCA violations, she was not "merely acting in accordance with [her] employment obligations to put [her] employers on notice." *United States ex rel. Williams*, 389 F.3d at 1261 (internal quotation omitted).

As to the first element of the prima facie case, for Omwenga to show that she was engaging in protected activity, she must have tried to prevent a false claim (or something that could reasonably be suspected to be a false claim) from occurring. *See id.* at 1261 ("Congress intended to protect employees while they are collecting information about a possible fraud. . . . Thus, it is sufficient that a plaintiff be investigating matters that reasonably could lead to a viable False Claims Act case.") (internal quotation marks and citations omitted). Omwenga asserts that on five separate occasions she reported impermissible fund allocation and possible fraud indicators to various UNF employees, and that this was protected activity. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9; Mot. Summ. J., Ex. 16.

The first such occasion Omwenga alleges was her discussion with Burton and Sonti about the "fraudulent charges" on a Mobile Hub Project document that was submitted for government reimbursement. *See* Pl. Resp. to Def.'s SOF ¶ 72; Pl. Resp. to Mot. Summ. J., Ex. 1, Omwenga Dep. at 295:6–298:5. The document detailed $124,000 in non-existent contract work that was expensed to USG funding, and specifically outlined penalties for false or fraudulent submissions. *See* Pl. Resp. to Def.'s SOF ¶ 72; Pl. Resp. to Mot. Summ. J., Ex. 1, Omwenga Dep. at 289:12– 22. "'[S]everal courts have said that internal reporting of false claims is itself an example of a protected activity' that can give rise to an FCA retaliation action." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 99 (D.D.C 2014) (quoting *United States ex rel. Yesudian*, 153 F.3d at 741 n.9). Because her actions in reporting possible false claims on a project for which she was not ultimately responsible are akin to an investigation, and separate from her normal job duties, the court finds that Omwenga has proffered sufficient evidence that she engaged in protected activity.

Consistent with the reasoning above, Omwenga's other complaints about improprieties are also protected. First, on December 5, 2014, she e-mailed Campo, Cortez, and Burton and explained that a sub-award was expensing funds for items unrelated to the project. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9; Mot. Summ. J., Ex. 16. Second, around early December 2014, she e-mailed McDermott and Campo and told them they were not allowed to post transactions to projects whose award documents were not yet issued. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9. Third, on January 29, 2015, Omwenga e-mailed Hurley, Cortes, and Burton, asking them to justify $124,000 in unallowable expense charged to USAID. *Id.* Finally, on January 29, she gave Burton a document highlighting possible indications of fraud. *See id.*; Pl. Resp. to Mot. Summ. J., Ex. 1 at 298:1–303:13.

In each instance, Omwenga either went outside of her normal chain of command to express concerns with UNF's use of government funds or reported possible wrongdoing regarding a project for which she was not ultimately responsible.  *See* Pl. Resp. to Mot. Summ. J. Ex. 22, UNF Org. Chart.  These actions are enough to show that she engaged in protected activity.

Second, UNF was aware that Omwenga had been reporting potentially improper activity. An employer has been put on notice that its employee engaged in protected activity when "a reasonable factfinder could conclude that . . . the company was on notice that litigation [was] a reasonable possibility." *United States ex rel. Williams*, 389 F.3d at 1262 (internal quotation marks and citations omitted.)  Normally, it is fairly simple to show that an employer has been notified that an employee engaged in protected activity, but when the employee works in compliance, as did Omwenga, the task may be more difficult.  *See id.* at 1261 ("[W]ithout evidence that [the employee] expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in furtherance of an FCA action.") (internal quotation marks omitted) (alteration in original).  Therefore, the employee "must overcome the presumption that [she is] merely acting in accordance with [her] employment obligations to put [her] employer[] on notice." *Id.*  "[W]hen an employee acts outside [her] normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity." *Id.*  The evidence adduced shows that Omwenga notified UNF of her protected activity in both ways, i.e., by acting outside her normal job responsibilities and alerting a party outside the usual chain of command.

The evidence, viewed in the light most favorable to Omwenga, shows that she notified UNF of her protected activity when she reported potential FCA issues stemming from the Mobile Hub project, because she was not ultimately responsible for the compliance work on that project. *See* Pl. Resp. to Def.'s SOF ¶ 46; Pl. Resp. to Mot. Summ. J., Ex. 20, Axelrod Dep. at 169:3–169:11. Therefore, because all five instances of Omwenga's protected activity stemmed from the Mobile Hub project, a reasonable factfinder could determine that her disclosures were outside of her job responsibilities, and that UNF could reasonably expect litigation as a result of her reported activity.

Moreover, Omwenga provided evidence that she alerted UNF employees outside her chain of command—such as Campo, Cortes, Sonti, and Hurley—about her protected activity. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9; Pl. Resp. to Mot. Summ. J., Ex. 22, UNF Org. Chart. Because she did so, and because this deviation from the chain of command is also enough to give an employer notice that an employee is engaging in protected activity, a reasonable factfinder could conclude that UNF was notified of Omwenga's protected activity. *See United States ex rel. Williams*, 389 F.3d at 1261.

As to the third element of a prima facie case, a finder of fact could reasonably conclude that Omwenga's protected activity was a cause of her termination. Causation requires that "the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity." *United States ex rel. Yesudian*, 153 F.3d at 736. In other words, a "plaintiff is required to produce evidence of retaliation sufficient for a reasonable jury to conclude that [her] protected activity was a contributing factor in the alleged prohibited personnel action." *Payne v. District of Columbia*, 722 F.3d 345, 353 (D.C. Cir. 2013). "In assessing the causal link between protected activity and a relator's termination, courts often consider the temporal proximity

between the employer's notice of the conduct and the relator's termination." *Pencheng Si*, 71 F. Supp. 3d at 102. Viewing the facts in the light most favorable to Omwenga, the court determines that all her protected activity occurred within three months of her termination, with the most recent occurring two weeks before she was fired, when she discussed instances of fraudulent or misallocated spending by UNF. *See* Def.'s Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9.

Omwenga also claims that UNF's stated reasons for her termination are pretextual. First, she contends UNF deviated from its employee handbook's discipline guidelines. *See* Pl. Resp. to Def.'s SOF ¶¶ 60, 77. "[A]n employer's violation of its own procedures can be evidence of pretext." *Greer v. Paulson*, 505 F.3d 1306, 1319 (D.C. Cir. 2007); *see also Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185, 191 (D.D.C. 2013) ("[D]eviations from standard procedures may . . . give rise to an inference of pretext at the summary-judgment stage.") (quotation marks and citations omitted). However, courts tend to give less weight to employer's non-adherence to an internal discipline policy when such adherence is not required. *See Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 286 (D.D.C. 2017).

There is no evidence in the record that Omwenga was verbally counseled about her communication and professionalism skills, or disciplined in any manner until February 5, 2015, a week before she was fired. *See* Pl. Resp. to Def.'s SOF ¶¶ 48–49, 58, 60, 78. This is inconsistent with the "Conflict Resolution and Progressive Discipline" guidelines in the UNF employee handbook, which encourage UNF to work with employees. *See* Pl. Resp. to Mot. Summ. J., Ex. 44 UNF handbook at 1. Moreover, Burton did not refer Omwenga for coaching, even when it was suggested by the HR director. Pl. Resp. to Def.'s SOF ¶¶ 75–77; *see* Def.'s Mot. Summ. J., Ex. 2, Burton Dep. at 283–87. Under the terms of the UNF employee handbook, coaching is a precursor to disciplinary action. *See* Pl. Resp. to Mot. Summ. J., Ex. 44 UNF

handbook at 1. Omwenga was also not given a written warning, decision-making leave, or an investigation suspension, all of which are suggested disciplinary actions if an employee must be disciplined after verbal counseling. *See* Pl. Resp. to Def.'s SOF ¶ 91; Pl. Resp. to Mot. Summ. J., Ex. 44 UNF handbook at 1. Although these actions are not mandatory, Nicolas Bacon, a UNF Executive Director, testified at his deposition that, other than an employee who engaged in years of bullying behavior, Omwenga was the only employee he could recall being terminated from UNF without it following the handbook's disciplinary policy. Pl. Resp. to Def.'s SOF ¶ 91.

Omwenga also argues that UNF's stated reason for disciplining and ultimately firing her was pretextual, because, although UNF employees had previously complained about her communication and professionalism skills, she was verbally disciplined by Burton two days after she told him and Sonti about her protected activity at lunch. Other courts have found pretext in retaliation cases when an employer disciplined an employee only after she engaged "in protect[ed] activity, even though [the employee] had not been disciplined for engaging in similar activity prior to her protected activity." *See, e.g., Williams v. Ricoh Americas, Corp.*, 203 F. Supp. 3d 692, 698 (E.D. Va. 2016).

Therefore, considering Omwenga's prima facie case and her evidence of pretext, the court concludes that a reasonable factfinder could infer retaliation, and UNF's motion for summary judgment with respect to the FCA retaliation claim (Count I) will be denied.

### D. NDAA Retaliation Claim

Omwenga alleges that after reporting to her superiors and co-workers about possible gross mismanagement of government grants and/or illegal activity regarding grant money, UNF terminated her, in violation of the NDAA's anti-retaliation provision, 41 U.S.C. § 4712, (Count VIII). The NDAA states:

An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1). To establish retaliation under § 4712, a plaintiff must show "that (1) she was an employee of a government contractor, (2) she disclosed information that she reasonably believed was evidence of a rule violation related to a federal contract to the required person, and (3) her disclosure was a contributing factor in the action taken against her." *Armstrong v. Arcanum Grp. Inc.*, 2017 WL 4236315, at *7 (D. Colo. Sept. 25, 2017). In *Armstrong*, the court stated:

> The NDAA does not follow *McDonnell Douglas*, but incorporates a similar framework into the statute itself by borrowing from an administrative-law statute. 41 U.S.C. § 4712(c)(6) provides that the legal burdens in 5 U.S.C. § 1221(e) shall be controlling for any judicial determination of whether retaliation occurred. [Section] 1221(e), in turn, requires that an employee show her protected activity was a "contributing factor" in the employment action taken unless the agency . . . "demonstrates by clear and convincing evidence that it would have taken the same personnel action" without disclosure. Thus, the questions asked are similar, but the NDAA collapses the *McDonnell Douglas* stages into a single question that the employer can only surmount with clear and convincing evidence as opposed to a preponderance of the evidence.

*Id.* Viewing the evidence in the light most favorable to Omwenga, the court finds that a disinterested observer with knowledge of the essential facts could conclude that Omwenga believed she was reporting gross mismanagement. Omwenga alleged that UNF charged "$124,000 [] to USAID for the Mobile Hub Project," Pl. Resp. to Mot. Summ. J., Ex. 1, Omwenga Dep. 289:16–22, and that "107,892.27 [was] charged to consultant's fees" for which there was no documentation, *id.* Ex. 50, UNF 1118; *see also* Ex. 51, UNF 1953. Because this court has already found that a reasonable factfinder could find retaliation for the same

disclosures under the FCA, *see supra* Section III, C., a reasonable factfinder could find "her disclosure was a contributing factor in the action taken against her" as required by NDAA. *See Armstrong*, 2017 WL 4236315, at *7.

UNF contends that Omwenga's claim under the NDAA fails because her disclosures were not made to the "required person." *Id.* Under the statute, disclosures must be made to a "management official or other employee of the . . . grantee who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G). Omwenga concedes that that she did not report her concerns to Rick Parnell, the Chief Operating Officer, to whom supervisors and managers were required to bring concerns of suspected fraud and legal violations. Pl. Resp. to Def.'s SOF ¶ 98; *see* Def.'s Mot. Summ. J., Ex. 44, UNF handbook at 1054. However, the UNF handbook also states that an individual's "immediate supervisor is in the best position to address an area of concern." Def.'s Mot. Summ. J., Ex. 44, UNF handbook at 1054. As laid out in the FCA portion of this opinion, Omwenga brought her concerns to her supervisor, Burton, at the February 4 lunch. *See* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9. Therefore, the court finds that a reasonable factfinder could conclude that she was fired for reporting what she believed to be gross mismanagement of a federal contract, and summary judgment will be denied to UNF with respect to Omwenga's NDAA Retaliation Claim (Count VIII).

### E. Wrongful Discharge

Finally, Omwenga alleges that she was discharged in violation of the public policy protections embedded in District of Columbia common law (Count II).

"[I]n the District of Columbia . . . an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d

28, 30 (D.C. 1991) (citations omitted). However, there is a very narrow public policy exception to this general rule. *Id.* at 34. "An exception warrants recognition if it is firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon and there is a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Herron v. Fannie Mae*, 861 F.3d 160, 170 (D.C. Cir. 2017) (quotation marks and citation omitted) (footnote omitted).

Omwenga advances two theories in support of a public policy exception: (1) her reports of gross fund mismanagement and (2) her disclosures of conflicts of interest. First, she cites 5 U.S.C. § 2302(8)(A), which outlines "prohibited personnel activity," including "tak[ing] . . . a personnel action . . . because of any disclosure of information by an employee . . . which the employee reasonably believes evidences . . . gross mismanagement [or] a gross waste of funds . . . ." In support of her second theory, she relies on 48 C.F.R. 3.101–1, which states "the general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."

UNF argues, that, as a threshold matter, these laws do not apply to it as a government "grantee." *See* Def.'s Mot. Summ. J. at 22–23. This argument is unavailing because it does not address the pertinent question: whether the statute and regulation "clearly reflect a policy prohibiting the activity about which the employee complained." *Leyden v. American Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 249 (D.D.C. 2015). Section 2302(8)(A) clearly reflects a public policy against gross mismanagement of funds by including it under "prohibited activity." The regulation establishes a policy against conflicts of interest by establishing the "general rule [of] strict[]" avoidance. *Cf. Liberatore v. Melville Corp.*, 168 F.3d 1326, 1331 (D.C. Cir. 1999) (recognizing a public policy exception when an employee was

terminated after notifying the employer of a violation of "legal proscriptions" surrounding food and drug regulations). Even if UNF is merely a "grantee," both the statute and the regulation are concerned with the use of government funds. Because Omwenga's reports about mismanagement and conflicts were based on UNF's use of the USAID grant, *see* Mot. Summ. J., Ex. 15, Pl.'s Interrog. Resp. No. 9, which is funding from a government agency, the statute and regulation clearly address Omwenga's reports.

However, to survive summary judgment on a claim of wrongful discharge in violation of public policy, Omwenga must show, *inter alia*, that a reasonable jury could find that she was terminated "at least predominat[ly]" in contravention of either public policy exception. *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 104 (D.C. 2018). Because the court has already found that a reasonable jury could find retaliation for the same disclosures under NDAA, *see supra* Section III, D, a reasonable jury could find she was terminated in contravention of the public policy against "gross fund mismanagement" under § 2302(8)(A). With respect to Omwenga's second public policy exception, based on 48 C.F.R. 3.101–1, no reasonable jury could find that she was terminated predominantly for disclosing conflicts of interest, when the uncontroverted evidence is that Omwenga only discussed the alleged conflicts once with her superior, Burton. *See* Pl. Resp. to Mot. Summ. J., Ex. 53, UNF 897. However, because, as noted above, a reasonable jury could conclude that Omwenga was terminated predominantly for her reports of gross mismanagement, summary judgment will be denied to UNF on the Wrongful Discharge Claim (Count II).

**IV. CONCLUSION**

For the reasons stated above, UNF's motion for summary judgment will be granted in part and denied in part. The motion will be granted with respect to Counts III, IV, V, VI, and VII, and it will be denied with respect to Counts I, II, VIII.

A corresponding Order will issue separately.

Date: September 30, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge